Michael P. Lehmann (SBN 77152)
Christopher L. Lebsock (SBN 184546)
Bonny E. Sweeney (SBN 176174)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **JESSICA McGEE,** individually and on behalf of all others similarly situated,<br><br><br>Plaintiff<br><br>v.<br><br>**ALTRIA GROUP, INC., ALTRIA ENTERPRISES LLC and JUUL LABS, INC.,**<br><br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**ANTITRUST CLASS ACTION COMPLAINT PURSUANT TO THE SHERMAN AND CLAYTON ACTS (15 U.S.C. §§ 1, 2, 3, 15, 18, 26)**<br><br>**DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................. 6

III.    INTRADISTRICT ASSIGNMENT ...................................... 7

IV.     PARTIES ............................................................................. 7

V.      AGENTS AND CO-CONSPIRATORS ................................ 9

VI.     CLASS CERTIFICATION ALLEGATIONS ..................... 10

VII.    FACTUAL ALLEGATIONS ............................................... 12

        A.   Development of E-Cigarettes And The Rise of JUUL.................. 12

        B.   JUUL's and Altria's 2018 Negotiations And The Resultant Non-Compete
             Agreement. ........................................................... 20

        C.   JUUL's Regulatory Problems And Altria's Responses.................. 24

VIII.   CLAIMS FOR RELIEF ...................................................... 32

        COUNT ONE........................................................... 32

        COUNT TWO ......................................................... 33

        COUNT THREE ..................................................... 37

        COUNT FOUR ....................................................... 40

        COUNT FIVE ......................................................... 44

IX.     DEMAND FOR JUDGMENT............................................ 45

X.      JURY TRIAL DEMANDED ............................................... 46

Plaintiff Jessica McGee ("Mcgee" or "Plaintiff"), on behalf of herself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against Defendants Altria Group, Inc. ("Altria Group"), Altria Enterprises LLC ("Altria Enterprises", together with Altria Group "the Altria Defendants"), and JUUL Labs, Inc. ("JUUL") (collectively "Defendants") for violations of Section 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3) and Section 7 of the Clayton Act (15 U.S.C. § 18) as follows. All allegations herein other than those concerning the Plaintiff are based on information and belief.

## I.    INTRODUCTION

1.    This lawsuit involves agreements among horizontal competitors—the Altria Defendants and JUUL—to eliminate competition by the Altria Defendants in the market for closed system electronic cigarettes ("e-cigarettes") (as defined below) in exchange for a partial ownership interest in JUUL. These agreements effectuated a horizontal allocation of the market in the sense that JUUL and Altria agreed that the latter would exit the market entirely and instead become a minority shareholder in the former. This conduct constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act and constituted an unlawful acquisition in violation of Section 7 of the Clayton Act.[1] The agreements also provide the basis for the claims that JUUL  monopolized the relevant market of closed system e-cigarettes sold in the United States and its territories and that JUUL and Altria conspired to monopolize that market, all in violation of Section 2 of the Sherman Act. This claim is not based on allegations of circumstantial evidence, but is instead based on explicit written agreements among the Defendants—the "Relationship Agreement", dated December 20, 2018; the "Amended Relationship Agreement", dated January 28, 2020; and a commitment letter from Altria to JUUL, dated October 5, 2018—that contained unequivocal non-compete provisions. On April 1, 2020, the Federal Trade Commission ("FTC") filed an administrative complaint ("FTC Complaint") challenging the lawfulness of both the agreement and the acquisition under Section 5 of the FTC Act (15 U.S.C. § 45) and noting that the conduct in question violated Section 1 of the

---

[1] Plaintiff alternatively has pled a claim that the agreement is also unlawful under a Rule of Reason analysis.

Sherman Act and Section 7 of the Clayton Act. *Federal Trade Comm'n v. Altria Group, Inc., et al.*, Dkt. No. 9393 (F.T.C. April 1, 2020).[2]

2.      JUUL's e-cigarette consists of two components: (a) a flat, rectangular device resembling a USB thumb drive that has a battery and temperature regulator and can be recharged by connecting to a USB port and (b) a pre-filled, non-reusable e-liquid cartridge (known as a "JUULpod") that serves as a mouthpiece and contains a fixed concentration of nicotine mixed with oils that mimics the ability of a cigarette to deliver nicotine to the human brain. The e-liquid formula ("JUULsalts") is proprietary, contains high levels of nicotine (as much as 0.7 mL or 59 mg/mL per pod), and is based on nicotine salts found in leaf-based tobacco, rather than free-based nicotine.[3] The system can deliver a nicotine peak in five minutes, which compares favorably with traditional combustible cigarettes.[4] Use of the loaded device creates a vapor, which is why use of a JUUL system is known as "vaping". The system is a closed one in the sense that it is not modifiable. Since its entry into the e-cigarette market in June of 2015, JUUL quickly became the

---

[2] A redacted version of the FTC Complaint is available at: https://www.ftc.gov/system/files/documents/cases/d09393_administrative_part_iii_complaint-public_version.pdf. The FTC action did not include claims under Section 2 of the Sherman Act, but the concurring statement of Commissioners Rohit Chopra and Rebecca Kelly Slaughter ("Chopra Statement") also said that the facts would sustain a claim under Section 5 of the FTC Act based on a theory of a conspiracy to monopolize in violation of Section 2 of the Sherman Act. https://www.ftc.gov/system/files/documents/public_statements/1570265/statement_of_comm_chopra_in_the_matter_of_altria-juul.pdf.

[3] Huang, J., Dwan C., Kwok, J., *et al.*, *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control 2019, 28:146-51 at 146 ("Huang Article") available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/2/146.full.pdf. JUUL currently has two strengths of nicotine in its JUULpods.  Each 5% JUULpod, as noted above, contains approximately 0.7mL with 5% nicotine by weight (approx. 40 mg per pod based upon 59 mg/mL) at the time of manufacture. Each 3% JUULpod is designed to contain approximately 0.7mL with 3% nicotine by weight (approx. 23 mg per pod based upon 35 mg/mL) at time of manufacture. https://www.juul.com/resources/JUUL-Pods-Cost-and-Pricing-Pods-Prices-for-All-Flavors.

[4] Huang Article at 146.

market leader, obtaining a 75% share by October of 2018.[5]

3.     The Altria Group was known until 2003 as Philip Morris Companies, Inc. and is the leading manufacturer of traditional combustible cigarettes in the United States and its territories. In light of the public outcry against and litigation concerning traditional cigarette use, it has expanded into related markets such as smokeless tobacco, cigars, and pipes, always attempting to obtain a dominant position. It entered the e-cigarette market in 2013, when its subsidiary NuMark began trials of the MarkTen e-cigarette.[6] The product was launched nationally in July of 2014[7] and was relatively successful. The Altria Group added to its e-cigarette portfolio by acquiring Green Smoke Inc. for nearly $110 million in cash and $20 million in incentive payments in April of 2014.[8] And in February of 2018, it introduced the MarkTen Elite, a pod-based closed system e-cigarette that resembled JUUL's product in both appearance and structure.[9] At one point, the Altria Group had a 16% share of the e-cigarette market, but its share had declined by mid-2018.[10]

---

[5] Truth Initiative, *Behind the explosive growth of JUUL*, available at https://truthinitiative.org/research-resources/emerging-tobacco-products/behind-explosive-growth-juul.

[6] CNBC, *Marlboro Maker Altria is Jumping Into E-Cigarettes*, available at https://web.archive.org/web/2019022814524 3/https://www.cnbc.com/id/100806458.

[7] M. Felberbaum, *Marlboro maker Altria Group to expand MarkTen electronic cigarette nationally in 2nd quarter*, available at https://web.archive.org/web/20190501084035/https://www.canadianbusiness.com/business-news/marlboro-maker-altria-group-to-expand-markten-electronic-cigarette-nationally-in-2nd-quarter/.

[8] Altria Group, *Altria Announces Agreement to Acquire E-Vapor Business of Green Smoke Inc.*, available at https://web.archive.org/web/20190501084258/https://www.businesswire.com/news/home/20140203005640/en/Altria-Announces-Agreement-Acquire-E-Vapor-Business-Green.

[9] Difference Between, *Difference Between MarkTen Elite and Juul*, available at http://www.differencebetween.net/science/health/difference-between-markten-elite-and-juul/.

[10] Levy D.T., Sweanor D., Sanchez-Romero L.M., *et al., Altria-Juul Labs deal: why did it occur and what does it mean for the US nicotine delivery product market* at 2 (2019) ("Levy Article")

4.     The former CEO of the Altria Group, Marty Barrington, laid out the rationale for his company's investment in e-cigarettes during a Consumer Analyst Group of New York conference held on February 21, 2018:

> [W]e knew the industry was evolving and adult tobacco consumers were seeking less harmful alternatives to combustible cigarettes. Preparing for this opportunity, we've spent years acquiring best-in-class regulatory and product development talent and building a compelling portfolio of non-combustible tobacco products with the potential to reduce risk. We've also relentlessly advocated for tobacco regulatory policy that supports bringing innovative reduced-risk products to market and enables manufacturers to communicate truthful information to consumers about those products. Happily, in July 2017, the U.S. Food & Drug Administration (FDA or Agency) adopted this approach as official policy, with the stated goal to "encourage innovative, less harmful and satisfying non-combustible products for adults who want or need nicotine."
>
> We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products. The range of tobacco products available in the U.S. is diverse when compared to many international markets, and different product platforms appeal to different U.S. adult tobacco consumers. That's why we're taking a portfolio approach, focusing on the three most promising platforms for U.S. adult tobacco consumers: smokeless tobacco and oral nicotine-containing products, e-vapor and heated tobacco. You'll hear more about each in a moment.
>
> Our approach is clear: to maintain our leadership in combustible tobacco products while vigorously pursuing this innovation aspiration. Going forward, our strategies are to:
>
> •Maximize income from our combustible tobacco businesses;
>
> •Grow income over time with non-combustible tobacco products;
>
> and
>
> •Manage our diverse income streams and strong balance sheet to deliver consistent financial performance over the long term.[11]

---

available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/08/30/tobaccocontrol-2019-055081.full.pdf.

[11] 2018 Consumer Analyst Group of New York (CAGNY) Conference, available at https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm.

4

5.      Seeing the success of JUUL, the Altria Group decided it wanted to buy JUUL and become the dominant market player, just as it was in the traditional cigarette market, where its Marlboro brand accounted for 40% of sales[12] or in the smokeless tobacco market, where the Altria Group has 55% of sales.[13] It commenced negotiations with JUUL, which intensified in the summer of 2018. As explained in the FTC Complaint, JUUL insisted that a precondition for a purchase of a stake in the company was that the Altria Group exit the market. As the FTC put it in paragraph four of its complaint, "[d]uring negotiations, [JUUL] insisted, and Altria recognized, that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal. When Altria sought to weaken or remove any obligation to exit that market, [JUUL] conveyed that any such attempt was completely unacceptable." The Altria Group accepted this condition in a letter to JUUL dated October 5, 2018 and began dismantling its e-cigarette operations, including pulling the MarkTen Elite products from the market.

6.      Negotiations resumed and a signed deal was reached on December 20, 2018. The Altria Group acquired a 35% stake in JUUL for $12.8 billion. The deal was reflected in a number of separate agreements, including: (a) the actual "Purchase Agreement"; (b) a "Services Agreement", whereby the Altria Group committed to provide various support services to JUUL; (c) an "Intellectual Property Licensing Agreement", which the Altria Group described in a Form 8-K filed with the Securities & Exchange Commission as giving JUUL a "non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field….";[14] and (d) the aforementioned "Relationship Agreement." In the Form 8-K, the Altria Group specifically noted that:

The Relationship Agreement generally prohibits Altria from

---

[12] Center for Disease Control & Prevention, *Tobacco Brand Preferences*, available at https://www.cdc.gov/tobacco/data_statistics/fact_sheets/tobacco_industry/brand_preference/index.htm.

[13]  Levy Article at 2.

[14] Page 3 of Altria Group Form 8-K dated December 19, 2018, available at https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871d8k.htm.

ANTITRUST CLASS ACTION COMPLAINT

competing, or otherwise acquiring an interest in an entity competing, in the e-vapor business for a period of at least six years from Closing [of the transaction], extendable thereafter unless terminated by Altria. If another person were to acquire 40% or more of Altria's voting power, or 30% of Altria's voting power combined with contractual control of a majority of Altria's board of directors, that person would also be subject to certain non-compete obligations set forth in the Relationship Agreement.[15]

7.      These provisions of the Relationship Agreement constitute a naked restraint of trade in the form of a market allocation between horizontal competitors. These provisions continued to be applied in the Amended Relationship Agreement entered into by Altria and JUUL on January 28, 2020. Such agreements constitute a *per se* violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), a conspiracy to monopolize in violation of Section 2 of the  Sherman Act (15 U.S.C. § 2), and an unlawful acquisition under Section 7 of the Clayton Act (15 U.S.C. § 18). Plaintiff and members of the proposed Class were injured by the elimination of the Altria Group as a competitor in the closed e-cigarette market, paid supracompetitive prices for JUUL's e-cigarettes as a result, and were denied the benefits of competitive innovation that could have existed had the Altria Group stayed in the market as an independent force.

## II.      <u>JURISDICTION AND VENUE</u>

8.      Plaintiff brings this action on his own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3) and Section 7 of the Clayton Act (15 U.S.C. § 18) , as well as any and all equitable relief afforded them under the federal antitrust laws.

9.      Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has

---

[15] *Id.*

transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States and its territories, including in this district. The anticompetitive conduct alleged herein has been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States and its territories, including in this District.

### III.    INTRADISTRICT ASSIGNMENT

10.    Pursuant to N.D. Cal. Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiff and members of the Class in counties located within the Division and JUUL's principal place of business is located within this Division.

### IV.    PARTIES

11.    Plaintiff Jessica McGee is a resident of Hugo, Minnesota. She purchased JUUL's closed system e-cigarette products directly from JUUL during the Class Period, defined as October 5, 2018 through the date on which Defendants' anticompetitive conduct ceases. McGee was injured in connection with her purchase during the Class Period as a result of Defendants' anticompetitive and unlawful conduct alleged herein.

12.    Defendant JUUL is a Delaware corporation with its principal place of business located at 560 20th Street, San Francisco, California 94107. JUUL is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in net revenue in 2018.[16] JUUL was initially a division of Pax Labs ("Pax"), a maker of vaporizers based in San Francisco. Pax was founded in 2007 by James Monsees ("Monsees") and Adam Bowen ("Bowen"), both graduates of the design program at Stanford University. Pax raised $13.9 billion in eight funding rounds from venture

---

[16] San Francisco Business Times, *Juul Labs revenue soars to more than $1 billion in 2018*, available at https://www.bizjournals.com/sanfrancisco/news/2019/02/01/juul-labs-revenue-soars-to-more-than-1-billion.html.

capitalists such as Fidelity Investment. JUUL's closed system e-cigarette was introduced in June of 2015 and Bowen said it packed a "bigger punch" as compared to other e-cigarettes because it contained ten times as much nicotine. He said that the idea behind the blend was to eliminate the need for smokers to go back to cigarettes after an unsatisfying experience with vaping. As its sales grew, Pax spun off the division and incorporated it as a separate company. Tyler Goldman, then the Chief Executive Officer ("CEO") of Pax, initially ran JUUL, but left in 2017. Kevin Burns ("Burns"), former head of yogurt maker Chobani, became the new CEO. Monsees is the company's chief product officer and Bowen is the company's chief technology officer.[17] During the Class Period, JUUL sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States. JUUL is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

13.     Defendant Altria Group is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia 22320. Prior to 2007, Altria Group also owned the international operations of Philip Morris. In 2007, the company decided to separate the firm's domestic and international operations. According to the Associated Press, the move cleared "the international tobacco business from the legal and regulatory constraints facing its domestic counterpart, Philip Morris USA."[18] Altria Group is one of the country's largest tobacco companies and was, prior to the anticompetitive agreements alleged, a manufacturer of closed-system e-cigarettes. At a preserved webpage formerly on its website, the Altria Group stated that:

> Altria Group holds diversified positions across tobacco, alcohol and cannabis. Through our wholly owned subsidiaries and strategic investments in other companies, we seek to provide category-leading choices to adult consumers, while returning maximum value

---

[17] This history of Pax and JUUL is set forth in more detail in Sharma, R., *The Company Behind JUUL* (Jan. 30, 2020), available at https://www.investopedia.com/news/which-company-behind-popular-ecigarette-juul/.

[18] Associated Press, *Altria to spin off Philip Morris International*, available at https://web.archive.org/web/20190516080244/http://www.nbcnews.com/id/20494757/ns/business-world_business/t/altria-spin-philip-morris-international/.

to shareholders through dividends and growth.

> Our tobacco companies – which have been the undisputed market leaders in the U.S. tobacco industry for decades – include some of the most enduring names in American business: Philip Morris USA, the maker of Marlboro cigarettes, and U.S. Smokeless Tobacco Company, the maker of Copenhagen and Skoal. We also own John Middleton, manufacturer of Black & Mild cigars, and Nat Sherman, a super-premium cigarette and cigar business. And we have 35 percent ownership of JUUL Labs, Inc., the nation's leading e-vapor company.[19]

14.     During the Class Period, the Altria Group sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States and its territories. The Altria Group is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement. As noted above, prior to those agreements, the Altria Group sold and marketed e-cigarettes under the brand names MarkTen and Green Smoke. In 2018, the Altria Group generated over $25.364 billion in worldwide net revenues.[20]

15.     Defendant Altria Enterprises is a wholly owned subsidiary of the Altria Group and is located at 6601 West Broad Street, Richmond, Virginia 22320. Altria Enterprises is a party to the anticompetitive and unlawful agreements alleged herein, including the aforementioned Relationship Agreement and Amended Relationship Agreement.

16.     Defendants Altria Group and Altria Enterprises are referred to collectively herein as "Altria."

## V.    AGENTS AND CO-CONSPIRATORS

17.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or

---

[19] *Altria, At-A-Glance*, available at https://web.archive.org/web/20190516075707/http://www.altria.com/About-Altria/At-A-Glance/Pages/default.aspx.

[20] Statista, *Net revenue of Altria worldwide from 2010 to 2019 (in million U.S. dollars)*, available at https://www.statista.com/statistics/500108/net-revenue-of-altria/.

control of Defendants' businesses or affairs.

18.     Defendants' agents operated under the authority and apparent authority of their principals.

19.     Defendants, through their subsidiaries, affiliates and agents operated as a single unified entity.

20.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

21.     Each Defendant acted as the principal, agent or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## VI.     CLASS CERTIFICATION ALLEGATIONS

22.     Plaintiff brings this action for damages and injunctive relief on behalf of herself and a class action of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), which is defined as follows:

> All persons or entities in the United States and its territories that purchased e-cigarettes directly from JUUL from October 5, 2018 until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

23.     This definition specifically excludes the following person or entities: (a) any of the Defendants named herein; (b) any of the Defendants' co-conspirators; (c) any of the Defendants' parent companies, subsidiaries, and affiliates; (d) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (e) all governmental entities; and (f) the judges and chambers staff in this case, as well as any members of their immediate families.

24.     Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants. Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, there are hundreds of thousands of Class members geographically dispersed throughout the United States and its territories, such that

joinder of all Class members in the prosecution of this action is impracticable.

25.     Plaintiff's claims are typical of the claims of its fellow Class members because Plaintiff directly purchased closed system e-cigarettes from JUUL. Plaintiff and all Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

26.     Numerous questions of law or fact common to the entire Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.     Whether Defendants combined or conspired with one another to raise, maintain or stabilize prices for e-cigarettes sold by JUUL at any time during the Class Period to purchasers in the United States and its territories;

b.     Whether Defendants combined or conspired with one another to allocate the market for the sale of closed system e-cigarettes to purchasers in the United States and its territories at any time during the Class Period by eliminating Altria as a competitor;

c.     Whether Defendants conspired to monopolize the market for closed system e-cigarettes sold in the United States and its territories;

d.     Whether there is here a relevant product market of closed system e-cigarettes and a relevant geographic market of the United States and its territories;

e.     Whether JUUL unlawfully obtained and/or maintained monopoly power in the market for closed system e-cigarettes sold in the United States and its territories;

f.     Whether Defendants' conduct caused the prices of e-cigarettes sold by JUUL at any time during the Class Period to purchasers in the United States and its territories to be artificially raised, maintained or stabilized at supracompetitive prices or price levels;

g.     Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages;

h.     Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

27.     These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

28.    Plaintiff will fairly and adequately represent the interests of the Class because she directly purchased closed system e-cigarettes from JUUL and she has no conflicts with any other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who is experienced in prosecuting antitrust class actions, as well as other complex litigation.

29.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

30.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

31.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.    FACTUAL ALLEGATIONS

### A.    Development of E-Cigarettes And The Rise of JUUL

32.    The e-cigarette market was initially populated in part by a group of conventional cigarette manufacturers—Altria, Imperial Tobacco Group plc ("Imperial Tobacco"), Japan Tobacco International ("Japan Tobacco"), and British American Tobacco ("BAT")—who were looking to diversify away from their regular cigarette business and by smaller companies like NJoy. NJoy entered the market in 2010, while the tobacco companies entered the market between 2011 and 2014, all before JUUL arrived on the scene in mid-2015. By 2013, the e-cigarette business had revenues of $1.7 billion a year.[21] The numbers increased exponentially when JUUL entered the market.  The following chart, taken from a 2018 research article,[22] shows the dollar

---

[21] Matt Richtel and Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times, Aug. 27, 2018 ("8/27/18 N.Y. Times Article"), available at https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html?referringSource=articleShare.

[22] Huang Article at 148.

sales by company from 2011–17 with respect to retail channels tracked by the A.C. Nielsen Company ("Nielsen"):

**Research paper**



Figure 1    Sales dollar of e-cigarettes in Nielsen-tracked retail channels: by brand 2011–2017.

33.    As can be seen, by the fourth quarter of 2017, JUUL had more sales than any of its competitors, although Altria's sales numbers had been expanding over time.

34.    The market shares of competing traditional tobacco companies declined as a result of JUUL's entry and success. A 2018 research letter published in the *Journal of the American*

13

*Medical Association* graphically depicts this development for the period from 2013–17.[23]





Figure. e-Cigarette Unit Sales and Market Share of e-Cigarette Unit Sales, by Manufacturer—United States, 2013-2017

35.    Other competitors in the market suffered setbacks that limited their ability to compete. One example is NJoy, which had been a pioneer in the market. As described in the 8/27/18 N.Y. Times Article cited above:

---

[23] King, B., Gammon, G., *et al*., *Electronic Cigarette Sales in the United States, 2013-2017*, Journal of the American Med. Ass'n, 320: (13), 1379-80 at 1380 (2018), available at https://jamanetwork.com/journals/jama/fullarticle/2705175.

NJoy gambled on an e-cigarette that looked virtually identical to a cigarette. It was a mistake, said Craig Weiss, the chief executive who pushed the so-called cigalike strategy and now consults for Juul. As NJoy's fortuned flagged, he said he realized that people didn't want a product that looked so much like a cigarette that it still left them with the stigma of being a smoker. NJoy filed for Chapter 11 bankruptcy in 2016, later re-emerging.

36.    Likewise, in April of 2018, R.J. Reynolds Vapor Co., a subsidiary of BAT, had to recall its Vuse Vibe Power Units used in its e-cigarettes because of overheating, which led to a supply disruption.[24]

37.    By October of 2018, JUUL had obtained a monopolistic share of the e-cigarette market, as reflected in the following pie chart taken from a December 6, 2018 presentation by the Social Science Research Center at Mississippi State University ("Mississippi Presentation"):[25]



Source: Wells Fargo

[24] *See* FDA, *Urgent: Voluntary Product Recall of Vuse Vibe Power Units*, available at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/urgent-voluntary-product-recall-vuse-vibe-power-units.

[25] This chart is available at https://mstobaccodata.org/wp-content/uploads/2019/01/JUUL-and-

38.    In a February 11, 2019 presentation, an analyst at Wells Fargo Securities, LLC said that JUUL "re-ignited" the e-cigarette category and depicted its dominance in the following chart.[26]



39.    Altria is the "MO" listed in this chart and it reflects the company's withdrawal from the market in late 2018 as a consequence of its non-compete agreement with JUUL.

40.    What accounted for JUUL's rapid success? One factor was its slick, trendy packaging, as depicted below.

Other-Emerging-Products_12.6.18.pdf.

[26] Bonnie Herzog, *Wall Street Tobacco Industry Update* at 3 (Feb. 11, 2019), available at http://www.natocentral.org/uploads/Wall_Street_Update_Slide_Deck_February_2019.pdf.

ANTITRUST CLASS ACTION COMPLAINT



41.     The Mississippi Presentation noted that it was the first e-cigarette that was "easy to use, maintain, and provide high levels of nicotine"; it was dubbed as the "iPhone of e-cigarettes". The starter pack depicted above had a retail price of $44.99 and a pack of four JUULpods cost $15.99. The presentation noted further that the device and the JUULpods were available "directly from JUUL Labs, Inc., other online retailers, and at 12,000 convenience stores in the U.S." By 2019, according to published reports, JUUL products were sold in 100,000 stores nationwide in addition to its own online retail portal.[27]

42.     Another factor in the success of the product noted in the Mississippi Presentation was that "[e]arly research indicates youth who were not previously at risk for initiating cigarette smoking are initiating nicotine use with Juul e-cigarettes." The same presentation noted that the product was introduced with an assortment of flavors—Mango, Cool Mint, Virginia Tobacco, Cool Cucumber, Classic Menthol, Fruit Medley, Creme Brulee, Classic Tobacco—some of which appealed directly to teenagers and children. The 8/27/18 N.Y. Times Article referenced above noted that:

---

[27] Dees Stribling, *E-Cig Company Juul Planning Retail Stores,* Bisnow (May 21, 2019), available at https://www.bisnow.com/national/news/retail/e-cig-company-juul-planning-retail-stores-99218.

> While the [JUUL advertising] campaign [developed in 2015] wasn't targeted specifically at teenagers, a former senior manager said that he and others in the company were well aware it could appeal to them. After Juuls went on sale in June 2015, he said, the company quickly realized that teenagers were, in fact, using them because they posted images of themselves vaping Juuls on social media…
>
> . . . .
>
> The former Juul manager, who spoke to The New York Times on the condition that his name not be used, saying he worried about facing the ire of the company, said that within months of Juul's 2015 introduction, it became evident that teenagers were either buying Juuls online or finding others who made the purchases for them. Some people bought more Juul kits on the company's website than they could individually use — sometimes 10 or more devices.
>
> "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."

43.    Another factor in the success of JUUL's product was the way in which it was marketed through, *inter alia*, social media like Twitter, Instagram, or YouTube. As explained in the Huang article referenced above:

> Importantly, our study shows that the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms. The marketing of other major retail e-cigarette brands, at least in their early stages, relied heavily on either advertising on TV (eg, Blu and Njoy) or promotional expenditures to retailers and consumers (eg, Vuse and MarkTen), or both. However, JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market and promote its products. In particular, we found the number of JUUL-related tweets was highly correlated with quarterly retail sales of JUUL. In addition to Twitter, JUUL was heavily marketed and promoted on Instagram and YouTube. The official JUUL account on Instagram, for example, used a variety of marketing and promotional schemes to attract, engage with and retain followers. The account used artsy, professional-grade photographs to display its products and evoke lifestyle feelings such as relaxation, freedom and sex appeal. Those posts also heavily emphasised JUUL's variety of flavours. Related accounts heavily marketed and promoted JUUL and associated products including pods, skins and accessories. The seven JUUL-related Instagram accounts identified in this study have amassed over a quarter million followers. Additionally, the number of JUUL-related YouTube videos exceeded 100 000 as of 1 March 2018 and engagement with the videos was high. In addition to Twitter, Instagram and YouTube, a recent study found more than 15 000 members discussed JUUL-related themes on Reddit.

18

> Our study also found innovative, cross-platform marketing campaigns to promote JUUL such as 'Doit4juul.' Smaller, targeted campaigns such as JUUL.girls also had a large presence across platforms. Our study reveals affiliate marketing as an important promotional method for JUUL on social media. Such marketing appears as Instagram accounts created by online vendors and product reviews on YouTube. While we cannot verify whether individuals are paid for their JUUL reviews, one young adult reportedly made thousands a month for vaping and reviewing vaping devices on YouTube.[28]

44.     Thus, while a company like Altria used marketing techniques learned from its experience with the conventional cigarette industry, such as promotional expenditures to retailers and consumers that delivered price savings to customers (as reflected by the FTC's reference in paragraph 67 of its Complaint to Altria's implementation of a major campaign for shelf space in 2018 that involved slotting fees, retailer discounts, and fixture payments), JUUL favored the use of manipulative social media campaigns.[29]

45.     As noted earlier, Altria did fight back with the MarkTen Elite, a slim electronic device with a rechargeable battery and prefilled pods that was similar to JUUL's system. Unlike JUUL's product, the MarkTen Elite was marketed with heavy promotional coupons. One advertisement indicated that a MarkTen Elite device and two pod packs could be purchased for as little as $5.99 and a battery and two pod packs could be purchased for $9.95.[30] The non-compete agreement between Altria and JUUL put an end to this price rivalry. This fact is significant because there is evidence that price differentials are important to consumers of e-cigarettes.[31]

---

[28] Huang Article at 150 (footnotes omitted).

[29] JUUL's idea of a promotion is reflected currently on its website at https://www.juul.com/promo-code-coupon-offers?&ag=CA. A customer may obtain a "free portable charging case" once there is a commitment to at least a three-month auto-ship subscription with minimum purchases of two JUULpod four-packs per month at regular prices.

[30] See https://picclick.com/MARKTEN-ELITE-Cigarette-E-Cig-E-Vapor-Device-113215478911.html.

[31] See Haung, J., Tauras, J., and Chaluopka, F.J., *The impact of price and tobacco control policies on the demand for electronic nicotine delivery systems,* Tobacco Control 23: iii41-iii47

46.    JUUL also positioned its product as a healthy alternative to use of conventional cigarettes; in repeated press releases, it noted how sales of traditional cigarettes were declining while sales of its product were increasing.[32] As will be explained below in detail, this strategy, coupled with its marketing directed at teenagers and children, boomeranged, leading to investigations by the United States Food and Drug Administration ("FDA") and 39 state attorneys general and a wave of litigation involving claims of product liability and deceptive marketing; it also led to Altria placing some of its own executives in management and revising some of the 2018 agreements with JUUL.

**B.    JUUL's and Altria's 2018 Negotiations And The Resultant Non-Compete Agreement.**

47.    The negotiations between Altria and JUUL that led to the Relationship Agreement of December 20, 2018 were not publicly documented. JUUL is a private company and has minimal public reporting obligations. Altria only reported on the end result, as reflected in its aforementioned Form 8-K. The allegations that follow are therefore based on the disclosures in the FTC Complaint, which was partially redacted.

48.    As noted above, by the summer of 2018, JUUL had made it clear to Altria that the latter's acquisition of a stake in the former was conditioned on Altria's withdrawal from the e-cigarette market and discontinuance of its MarkTen Elite brand, which JUUL clearly perceived as a competitive threat. That position was communicated unequivocally by Tim Danaher, the former Chief Financial Officer ("CFO") of JUUL; Burns, its former CEO; and Riz Valani ("Valani"), a member of its Board of Directors. On July 30, 2018, Nick Pritzker ("Pritzker"), another member

---

(2014), available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/23/suppl_3/iii41.full.pdf.

[32] *See* JUUL Labs, Inc., *Cigarette Sales In The U.S. Continue Historic Decline Into The First Quarter Of 2019*, available at https://newsroom.juul.com/cigarette-sales-in-the-u-s-continue-historic-decline-into-the-first-quarter-of-2019/; *Cigarette Decline Rates Accelerate As Juul Share Grows*, available at https://newsroom.juul.com/cigarette-decline-rates-accelerate-as-juul-share-grows/; *JUUL Labs Presents New Data On The Role Of Flavors In Switching From Combustible Cigarettes*, available at https://newsroom.juul.com/juul-labs-presents-new-data-on-the-role-of-flavors-in-switching-from-combustible-cigarettes/.

ANTITRUST CLASS ACTION COMPLAINT

of JUUL's Board, sent Howard Willard ("Willard"), the CEO of the Altria Group who later retired in April of 2020, a draft term sheet for an agreement that incorporated this requirement.

49.    On August 1, 2018, Pritzker, Valani, Burns, Willard, and Billy Gifford, the Altria Group's CFO, met at the Park Hyatt Hotel in Washington, D.C. to discuss the term sheet; no lawyers for either company were permitted to attend. It was clear to Willard that Altria's exit from the e-cigarette market was a precondition to any deal with JUUL. Altria attempted to no avail to modify this demand in discussions held on August 5, 2018. Pritzker, Valani, and Burns reiterated JUUL's position in a mark-up of the term sheet dated August 9, 2018. Valani repeated this blunt message in a meeting with Dinny Devitre, a member of the Altria Group Board of Directors, on August 15, 2018.

50.    The negotiations stalled at that point and Willard capitulated. He stated orally that he would accept this precondition and confirmed it in a letter to Pritzker, Valani, and Burns, dated October 5, 2018. On October 25, 2018, Altria announced that it was suspending its MarkTen Elite business, purportedly in deference to the FDA's concerns about e-cigarettes that attracted juvenile buyers.[33]

51.    As a result, MarkTen Elite products were no longer available online and inventories in the hands of retailers would not be replenished.[34] A few days later, Altria and JUUL agreed to the basic deal terms. On December 7, 2018, Altria announced that it was exiting the e-cigarette business entirely.[35] On December 20, 2018, the Altria-JUUL agreements were finalized.

> In publicly announcing the deal, JUUL said in a press release:
> Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a

---

[33] *See* Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times, Oct. 25, 2018, available at https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html?referringSource=articleShare.

[34] Markten, *Markten® E-Vapor*, available at https://www.markten.com.

[35] Angelica LaVito, *Altria shutters its e-cigarette brands as it eyes Juul, awaits iQOS decision*, CNBC, available at https://www.cnbc.com/2018/12/07/altria-closes-e-cigarette-brands-as-it-eyes-juul-awaits-iqos-decision.html.

minority investment of $12.8 billion into JUUL for a 35% ownership in the company along with services to accelerate our mission. We understand the controversy and skepticism that comes with an affiliation and partnership with the largest tobacco company in the US. We were skeptical as well. But over the course of the last several months we were convinced by actions, not words, that in fact this partnership could help accelerate our success switching adult smokers. We understand the doubt. We doubted as well. We made it very clear that any investment would need to meet demanding and specific criteria to ensure that they are committed to our mission.[36]

52.   One of these criteria was that "an investor would have to allow JUUL to remain in control."[37] The anticompetitive non-compete clause was not mentioned by JUUL.

53.   Article 3.1 of the Relationship Agreement between JUUL and Altria set forth the non-compete agreement. It reads, in relevant part:

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .[38]

---

[36] JUUL Labs, Inc., *JUUL Statement About Altria Minority Investment And Service Agreements*, available at https://newsroom.juul.com/juul-statement-about-altria-minority-investment-and-service-agreements/.

[37] *Id.*

[38] The full text of the Relationship Agreement is available at

54.    Article 3.2 further prohibited competition on an indirect basis.

55.    As noted above, the Relationship Agreement was amended on January 28, 2020. That amendment is discussed in detail below.

56.    Contemporaneous analysts noted the potential anticompetitive aspects of what JUUL and Altria did in entering into the Relationship Agreement. In one 2019 article, it was stated:

> This deal directly removes Altria as an independent competitor in the vaping market by terminating its sales of MarkTen. Before Juul entered the US vaping market, Nielsen data from mass market retail (eg, pharmacies and grocery stores) indicated that Altria had a 16% share and the four cigarette companies had a 72% combined share in 2015.
>
> By September 2018, Juul had 72% of the market (dollar value, 55% in units sold), while the share of Altria fell to 7% by July 2018 and combined cigarette firm shares fell to 25%. However, mass market retail was estimated to be 40% of the entire vaping market. Although information is limited on market shares in the vape shop or online consumer channels, cigarette manufacturers have generally not sold their vaping products in these sectors.
>
> With MarkTen having had a small and declining vaping market share, the impact of their exit from the market is likely to be minimal. However, Altria's potential role as a future competitor is likely more important. After the Juul Labs deal, Altria has less incentive to introduce new vaping products….
>
> The deal can also impede competition by Altria working with Juul Labs (eg, through onserts on the outside of packages with coupons for Juul and providing their customer lists for marketing purposes) to insure that those smoking Altria products (eg, Marlboro) switch to Juul rather than other e-cigarette companies' products. To the extent that brand loyalty is created for Juul products, new entrants will face greater barriers to market entry. In addition, Altria is likely to help Juul Labs fight patent infringement cases.[39]

57.    The FTC echoed some of these concerns in its Complaint. As the FTC noted in paragraph 62 of its Complaint, the effect of the JUUL-Altria agreement was to: (a) "eliminat[e] MarkTen products from the relevant market, thereby eliminating current and future price competition between [JUUL and Altria], in particular promotional activity to create awareness and

https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex22.htm.

[39] Levy Article at 2 (footnotes omitted).

drive sales"; (b) eliminate "current and future innovation competition" between the companies; and (c) eliminate "current and future competition between [JUUL and Altria] for shelf space at retailers through rebates and other incentives." All of these identified harms constitute injury to Plaintiff and members of the Class.

58.     Altria acquired a 35% stake in JUUL for $12.8 billion as a result of the deal. For this amount, Altria got one "observer" to JUUL's Board, at least until the FTC cleared the transaction, which it obviously has not. As the FTC explained at paragraphs 23–24 of its Complaint with respect to the other agreements entered into between JUUL and Altria:

> Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to [JUUL], divided between Initial and Extended Services.  The Initial Services included leasing convenience store shelf space to [JUUL], regulatory consulting, and distribution support; the Extended Services included direct marketing support and sales services.  Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services.  The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency.  If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint [JUUL] board members and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against [JUUL].

> The Intellectual Property License Agreement grants [JUUL] a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.

59.     The Relationship Agreement constitutes *per se* antitrust violations of Section 1 and 3 of the Sherman Act and collusive conduct in violation of Section 2 of the Sherman Act. JUUL and Altria are separate companies; neither owned the other. No joint venture was created between them. Instead, they were horizontal competitors who agreed that one of them would exit the market.

**C.     JUUL's Regulatory Problems And Altria's Responses.**

60.     Even before the Altria-JUUL deal was finalized, JUUL was facing severe regulatory criticism for marketing its e-cigarette products to teenagers. In April of 2018, FDA

Commissioner Dr. Scott Gottlieb ("Gottlieb") announced a "Youth Tobacco Prevention Plan" that would close access to e-cigarettes by minors; he pointed to numerous illegal sales of JUUL products in this respect.[40] In September of 2018, the FDA announced that it had undertaken the largest coordinated enforcement effort in its history issuing 1,300 warning letters or fines to retailers who sold JUUL and other e-cigarettes to minors as part of an "undercover blitz" of brick-and-mortar and online retailers.[41] The agency also served JUUL and other manufacturers with comprehensive document requests.[42] JUUL reported providing the agency with over 50,000 pages of documents.[43]

61.    JUUL reacted to the FDA criticism. On November 3, 2018, it discontinued retail sales of its mango, cucumber, creme and fruit JUULpods to third party retailers and instead limited the distribution of these products to JUUL's own online shop.[44] This move was not as radical as it might seem. It has been noted in another context that these fruit-flavored products account for only

---

[40] See FDA, *Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes*, available at https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention.

[41] See FDA, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, available at https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more.

[42] *Id.*

[43] JUUL Labs, Inc., *Statement Regarding Recent FDA Inspection*, available at https://newsroom.juul.com/statement-from-kevin-burns-juul-labs-chief-executive-officer-regarding-recent-fda-inspection/.

[44] JUUL Labs, Inc., *JUUL Labs Action Plan*, available at https://newsroom.juul.com/juul-labs-action-plan/.

ANTITRUST CLASS ACTION COMPLAINT

"10% of JUUL's sales."[45]

62.    That was not enough for the agency. On September 9, 2019, the FDA sent JUUL a warning letter that stated: "[b]ased on our review of the information described above, FDA has determined that JUUL adulterated its products under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution."[46] Thus, JUUL was accused of illegally selling its e-cigarettes. JUUL responded by first eliminating sales in the United States and its territories of its fruit-flavored JUULpods on October 17, 2019.[47] Thereafter, JUUL eliminated sales of mint-flavored JUULpods on November 7, 2019.[48]

63.    Gottlieb was also not pleased with Altria after it became a stakeholder in JUUL. On February 6, 2019, he wrote a letter to Willard of Altria saying Altria's plans for JUUL "contradict[ed] the commitments you made to the FDA in a meeting" held on October 18, 2018. He demanded another meeting and said that "[w]hen we meet, Altria should be prepared to explain how this acquisition affects the full range of representations you made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes."[49] Altria, JUUL, and Gottlieb met in March of 2019, but Gottlieb was reported as saying

---

[45] CBS News, *Juul halts sales of fruit and dessert flavors for e-cigarettes* (Oct. 17, 2019), available at https://www.cbsnews.com/news/juul-halts-sales-of-fruit-and-dessert-flavors-for-e-cigarettes-vaping-today-2019-10-17/.

[46] FDA, *Warning Letter JUUL Labs, Inc.*, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[47] JUUL Labs, Inc., *JUUL Labs Suspends Sale Of Non-Tobacco, Non-Menthol-Based Flavors In The U.S.*, available at https://newsroom.juul.com/juul-labs-suspends-sale-of-non-tobacco-non-menthol-based-flavors-in-the-u-s/.

[48] https://newsroom.juul.com/juul-labs-stops-the-sale-of-mint-juulpods-in-the-united-states/.

[49] S. Gottlieb, Letter to Howard A. Willard III, dated 6 February 2019, available a https://web.archive.org/web/20190304113102/https://www.fda.gov/downloads/TobaccoProducts/Labeling/RulesRegulationsGuidance/UCM630925.pdf.

that the meeting was "difficult" and that "he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul."[50] The concurring statement of FTC Commissioners Copra and Slaughter in support of the filing of the FTC Complaint cited above reached a similar conclusion:

> [I]n October 2018, Altria publicly claimed that it was discontinuing its e-cigarette product due to concerns about youth vaping. This appears to be a pretext, as it was simultaneously looking to strike a massive deal with JUUL. With Altria's MarkTen out of the market, basic economic logic suggests that JUUL could capture those sales and further dominate the market.[51]

64.    The problems that JUUL and Altria had with the FDA were not the only ones they faced with regulators. In 2019, various states and municipalities began imposing bans on JUUL and/or vaping products.[52] More recently, in February of 2020, a coalition of 39 states indicated that they will be investigating the marketing and sales of vaping products by JUUL, including whether the company targeted youths and made misleading claims about the nicotine content in its e-cigarette devices.[53]

65.    In light of this cascade of bad news, Altria reacted by flexing its muscle as a shareholder and precipitating the ouster of some of JUUL's management. In September of 2019, Burns resigned as JUUL's CEO, and was replaced by K.C. Crosthwaite ("Crosthwaite"), a Senior Vice-President of Altria Group who served as its Chief Growth Officer, oversaw Altria's entry into the e-cigarette market and was Altria's designated interim "observer" on JUUL's Board

---

[50] K. Rooney, A. LaVito, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul,* CNBC News, 19 (March 2019), available at https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html; A. Edney, *FDA Chief to Keep Heat on E-Cigarette Makers as He Departs,* available at https://web.archive.org/web/20190501083309/https://www.bloomberg.com/news/articles/2019-03-19/gottlieb-says-fda-may-need-to-pull-nicotine-pods-from-market.

[51] Chopra Statement at 2.

[52] *See* Drugwatch, *Juul Ban*, available at https://www.drugwatch.com/e-cigarettes/juul-ban/.

[53] Dave Collins & Matthew Perrone, *'A world of hurt': 39 states to investigate Juul's marketing* (Feb. 25, 2020) , available at https://apnews.com/bc0ebafd2c6604e2ac26c6ee219c35b4.

pursuant to the terms of the Relationship Agreement.[54] Crosthwaite is in the process of revamping certain executive positions. In October of 2019, he brought in as JUUL's new chief regulatory officer Joe Murillo ("Murillo") of the Altria Group; Murillo was the head of regulations at the Altria Group and previously ran the e-cigarette side of its business.[55]

66.     Altria also took the opportunity to revise some of its December 2018 agreements with JUUL. The Services Agreement, Voting Agreement, and Relationship Agreement between Altria and JUUL were amended on January 31, 2020. The FTC describes the amendments as follows in paragraphs 26–28 of its Complaint:

> Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to (1) appoint two (of nine) JLI directors; (2) nominate one (of three) [JUUL] independent directors; (3) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (4) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and [JUUL], i.e., "Joint Litigation Matters"); and (5) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change [JUUL's] senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant [JUUL's] CEO (1) a board seat, (2) a seat on the Litigation Oversight Committee, and (3) a seat on the Litigation Subcommittee.
>
> The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if [JUUL] is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.
>
> The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except as regards to Altria's provision of retail shelf space to [JUUL], which service terminates after March 31, 2020.

67.     On January 30, 2020 Altria had filed an SEC Form 8-K that further described the

---

[54] JUUL Labs, Inc., *JUUL Labs Names New Leadership, Outlines Changes To Policy And Marketing Efforts*, available at https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/.

[55] Carlie Porterfield, *Juul Hires Another Altria Exec To Handle Vaping Crackdown*, Forbes (Oct. 2, 2019), available at https://www.forbes.com/sites/carlieporterfield/2019/10/02/juul-hires-another-altria-exec-to-handle-vaping-crackdown/#6453ab412c72.

Amended Relationship Agreement as follows:

> The amendment to the Relationship Agreement provides for, among other things: (i) following antitrust clearance of the JUUL Investment, creation of a Litigation Oversight Committee of the JUUL board of directors, which will include two Altria designated directors (one of whom will chair such committee), that will have oversight authority and review of litigation management for matters in which JUUL and Altria are co-defendants and have or reasonably could have a written joint defense agreement in effect between them and, subject to certain limitations, will recommend to JUUL changes to outside counsel and litigation strategy by majority vote, with disagreements by JUUL's management being resolved by majority vote of JUUL's board of directors; and (ii) Altria to have the option to be released from its non-compete obligation (x) in the event JUUL is prohibited as a matter of federal law from selling vapor-based electronic nicotine delivery systems in the U.S. for a continuous period of at least 12 months (subject to tolling of this period in certain circumstances) or (y) if the carrying value of Altria's investment in JUUL is not more than $1.28 billion (which represents 10% of Altria's $12.8 billion initial carrying value of the JUUL investment).[56]

68.    The FDA has not prohibited JUUL from selling vaping products in the United States and its territories for at least a year. On January 2, 2020, the agency adopted a policy that prioritized its enforcement efforts with respect to e-cigarettes. It stated:

> On Aug. 8, 2016, all e-cigarettes and other ENDS [electronic nicotine delivery systems] products became subject to the FDA's tobacco authorities, including the premarket authorization requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act). All e-cigarettes and other ENDS products on the market at that time needed to have authorization from the FDA to be legally marketed. However, as an exercise of its enforcement discretion, the agency had deferred enforcement of the premarket authorization requirements. To date, no ENDS products have been authorized by the FDA — meaning that all ENDS products currently on the market are considered illegally marketed and are subject to enforcement, at any time, in the FDA's discretion.

> Beginning 30 days from the publication of the notice of availability of this guidance in the Federal Register, the FDA intends to prioritize enforcement against these illegally marketed ENDS products by focusing on the following groups of products that do not have premarket authorization:

---

[56] https://www.sec.gov/ix?doc=/Archives/edgar/data/764180/000076418020000005/a2019form8-kerq42019.htm. The Amended Relationship Agreement itself can be found at https://www.sec.gov/Archives/edgar/data/764180/000076418020000005/exhibit21q42019.htm.

29

—Any flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product);

—All other ENDS products for which the manufacturer has failed to take (or is failing to take) adequate measures to prevent minors' access; and

—Any ENDS product that is targeted to minors or likely to promote use of ENDS by minors.

Cartridge-based ENDS products are a type of ENDS product that consists of, includes, or involves a cartridge or pod that holds liquid that is to be aerosolized when the product is used. For purposes of this policy, a cartridge or pod is any small, enclosed unit (sealed or unsealed) designed to fit within or operate as part of an ENDS product.

By not prioritizing enforcement against other flavored ENDS products in the same way as flavored cartridge-based ENDS products, the FDA has attempted to balance the public health concerns related to youth use of ENDS products with considerations regarding addicted adult cigarette smokers who may try to use ENDS products to transition away from combustible tobacco products. In addition to data showing that cartridge-based ENDS products are most commonly used among youth, important findings from the 2019 Monitoring the Future survey focusing on youth use of JUUL indicate that youth preference for menthol- and tobacco-flavored e-cigarettes is much lower than that for mint- and fruit-flavored e-cigarettes. Because of the relatively low numbers of youth using both menthol- and tobacco-flavored, cartridge-based ENDS products, these products are not among the current enforcement priorities. However, should the FDA become aware of an increase of youth using any other flavored products (both cartridge-based or otherwise), the agency will take additional steps to address youth use of those products if necessary.

For all other products (cartridge-based or otherwise), including menthol-, tobacco-, and non-flavored ENDS products, the FDA will also prioritize enforcement where the manufacturer fails to take adequate measures to prevent youth access. For example, the FDA will consider whether the manufacturer has implemented adequate programs to monitor retailer compliance with age-verification and sales restrictions or if it has established and enforced penalties against retailers that fail to comply with those programs. The agency also will consider whether the manufacturer uses adequate age-verification technology (or requires that retailers who sell its products use such technology) to prevent underage access to its website and to prevent underage sales through the internet. In addition, consideration will be given to whether the manufacturer limits (or requires retailers who sell its products to limit) the quantity of ENDS products that a customer may purchase within a given period of time.

The FDA also intends to prioritize enforcement with respect to any

ENDS products that are targeted to youth or likely to promote use of ENDS by youth. Examples include: products marketed with labeling and/or advertising that resemble kid-friendly foods and drinks such as juice boxes or kid-friendly cereal; products marketed directly to minors by promoting ease of concealing the product or disguising it as another product; and products marketed with characters designed to appeal to youth.

Importantly, the FDA's enforcement priorities are not a "ban" on flavored or cartridge-based ENDS. The FDA has already accepted and begun review of several premarket applications for flavored ENDS products through the pathway that Congress established in the Tobacco Control Act. Manufacturers that wish to market any ENDS product – including flavored e-cigarettes or e-liquids – are required by law to submit an application to the FDA that demonstrates that the product meets the applicable standard in the law, such as whether the product is appropriate for the protection of the public health. If a company can demonstrate to the FDA that a specific product meets the applicable standard set forth by Congress, including considering how the marketing of the product may affect youth initiation and use, then the FDA could authorize that product for sale.

The guidance also states that, after May 12, 2020, the FDA intends to also prioritize enforcement against any ENDS products that continue to be sold and for which the manufacturers have not submitted a premarket application. For ENDS products other than those in the three groups described above, if premarket applications are submitted by that date, the FDA intends to continue to exercise enforcement discretion for up to one year pending FDA review of the applications, unless there is a negative action by the FDA on such application or the product is authorized to be marketed by the FDA.[57]

69.    Thus, the upshot of the FDA's guidance was that while it had the statutory power to force all e-cigarettes off the market as being sold illegally, it exercised its discretion not to do so and focused its enforcement authority on non-tobacco or non-menthol flavored e-cigarettes and e-cigarettes marketed to customers under the age of 21. JUUL had ceased selling fruit-flavored or mint-flavored e-cigarettes in October and November of 2019 and had modified its marketing policies so that it did not target persons under the age of 21. To this day, it continues to market e-cigarettes with Virginia Tobacco, Classic Tobacco, and Menthol flavoring. The FDA's notice

[57] FDA, *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint*, available at https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children. *See also* 85 Fed. Reg. 720 Jan. 7, 2020).

makes it clear that it has no intention of banning outright the sale of these types of e-cigarettes. The agency will be requiring manufacturers to submit premarket applications for e-cigarettes pursuant to the Tobacco Control Act by May 12, 2020 and this requirement applies to e-cigarettes already being marketed, but the FDA made it clear that tobacco-flavored or menthol-flavored e-cigarettes not being marketed to people under the age of 21 will be subject to an informal grace period of up to one year while the applications are being considered. JUUL is on record as saying it will be filing a premarket application in May of 2020.[58] So there is no immediate danger of JUUL being "prohibited by federal law from selling vaping products in the United States for at least a year" and the non-compete clause contained in the Relationship Agreement between JUUL and Altria remains in full force and effect.[59]

## VIII.    CLAIMS FOR RELIEF

### COUNT ONE
### RESTRAINT OF TRADE IN VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3—*PER SE* VIOLATION)

**(Against all Defendants)**

70.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

71.    Defendants entered into and engaged in continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of closed system e-cigarettes sold to purchasers in the United States and its territories.

---

[58] *See* JUUL Labs, Inc., *Our Commitment To The PMTA Process*, available at https://newsroom.juul.com/our-commitment-to-the-pmta-process/.

[59] Likewise, Altria has not written down the value of its $12.8 billion investment in JUUL below $1.28 billion. It has written down the value of that investment by a total of $8.6 billion, in separate writeoffs undertaken in October of 2019 and January of 2020. M. Corey Goldman, *Altria Writes Down Another $4.1 Billion of Its Juul Investment*, TheStreet.com (Jan. 30, 2020), available at https://www.thestreet.com/investing/stocks/altria-takes-another-massive-writedown-on-juul-investment.

72.     In particular, Defendants have combined and conspired to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

73.     These violations of Section 1 and 3 consisted of, *inter alia*: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL;  (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

74.     Defendants' activities constitute a *per se* violation of Sections 1 and 3 of the Sherman Act.

75.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price, promotional activity, and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories. For this conduct, Plaintiff and members of the Class are entitled to receive treble damages pursuant to 15 U.S.C. § 15.

76.     As reflected by the recent entry of Defendants into the Amended Relationship Agreement, Defendants' unlawful conduct is ongoing and has not ceased. The present and future conduct by Defendants creates irreparable injury to both the Plaintiff and the Class. Plaintiff and the Class are therefore also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

**COUNT TWO**

**RESTRAINT OF TRADE IN VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT (15 U.S.C. §§ 1, 3)—ALTERNATIVE RULE OF REASON VIOLATION)**

**(Against all Defendants)**

77.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein. This count is presented as an alternative to Count One in the event that the Court finds that the *per se* rule should not apply to Defendants' conduct.

78.     Defendants entered into and engaged in continuing combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1and 3 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition with respect to the sale, marketing and distribution of closed system e-cigarettes sold to purchasers in the United States and its territories.

79.     In particular, Defendants have combined and conspired to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

80.     These violations of Section 1 consisted of, *inter alia*: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL;  (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity and rivalry over shelf space by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

81.     Defendants' activities constitute a Rule of Reason violation of Section 1 and 3 of the Sherman Act.

82.     The relevant product market for the purposes of this Count is the sale of closed

system e-cigarettes. The relevant geographic market for the purposes of this count is the United States and its territories as a whole, where both JUUL and Altria marketed their e-cigarette products.

83.    This market definition is appropriate for all of the reasons identified by the FTC in paragraphs 36–42 of its Complaint:

> The relevant product market for the purposes of this action is closed-system e-cigarettes. A hypothetical monopolist in this relevant market would find it profitable to impose at least a small but significant and non-transitory increase in price ("SSNIP").
>
> E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarette: closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as JUUL or MarkTen Elite, which look like USB drives. Subsequent to the FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.
>
> By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).
>
> Closed-system e-cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers. The vast majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.
>
> Respondents considered their respective [JUUL] and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products.

35

Respondents further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

The relevant geographic market is no broader than the United States. Because of the FDA's PMTA [premarketing application] requirements, foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

84.     JUUL possesses monopoly power within this market. As noted above, within the e-cigarette market as a whole, JUUL has obtained a market share of as much as 75%. Its market power is demonstrated by its ability to demand as a contractual term that Altria exit from the business of making and selling e-cigarettes as a precondition to obtaining a 35% stake in JUUL, thus excluding a significant competitor.  JUUL also had power over wholesale and retail prices by virtue of its dominant position in the market, which was maintained through its unlawful agreements with Altria.

85.     JUUL's market power is also supported by the econometric analysis made by the FTC in paragraphs 43–45 of its Complaint:

At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

The federal antitrust agencies, consistent with the Merger Guidelines and federal court decisions, measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

In the U.S. market for closed-system e-cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200.  Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in

36

the relevant market.

86.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories, all without countervailing, or indeed any, procompetitive justifications. For this conduct, Plaintiff and members of the Class are entitled to receive treble damages pursuant to 15 U.S.C. § 15.

87.    As reflected by the recent entry of Defendants into the Amended Relationship Agreement, Defendants' unlawful conduct is ongoing and has not ceased. The present and future conduct by Defendants creates irreparable injury to both the Plaintiff and the Class. Plaintiff and the Class are therefore also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## COUNT THREE

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT— MONOPOLIZATION (15 U.S.C. § 2)

### (Against Defendant JUUL)

88.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

89.    Defendant JUUL unlawfully monopolized the relevant market for closed system e-cigarettes sold in the United States and its territories.

90.    This market definition is appropriate for all of the reasons identified by the FTC in paragraphs 36–42 of its Complaint:

> The relevant product market for the purposes of this action is closed-system e-cigarettes.  A hypothetical monopolist in this relevant market would find it profitable to impose at least a small but significant and non-transitory increase in price ("SSNIP").
>
> E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid").  There are two broad categories of e-cigarette: closed-system and open-tank.  Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and sealed cartridges or pods that are pre-filled

with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as JUUL or MarkTen Elite, which look like USB drives. Subsequent to the FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

Closed-system e-cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers. The vast majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

Respondents considered their respective [JUUL] and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Respondents further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

The relevant geographic market is no broader than the United States. Because of the FDA's PMTA [premarketing application] requirements, foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

91.     JUUL possesses monopoly power within this market. As noted above, within the

e-cigarette market as a whole, JUUL has obtained a market share of as much as 75%. Its market power is even greater within the closed system e-cigarette market. Its market power is demonstrated by its ability to demand as a contractual term that Altria exit from the business of making and selling e-cigarettes as a precondition to obtaining a 35% stake in JUUL, thus excluding a significant competitor. JUUL also had power over wholesale and retail prices by virtue of its dominant position in the market, which was maintained through its unlawful agreements with Altria.

92.     JUUL's market power is also supported by the econometric analysis made by the FTC in paragraphs 43–45 of its Complaint:

> At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

> The federal antitrust agencies, consistent with the Merger Guidelines and federal court decisions, measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

> In the U.S. market for closed-system e-cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

93.     JUUL maintained its monopoly power by unlawfully combining and conspiring with Altria to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, fixing, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

94.     These unlawful acts consisted of, *inter alia*: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL;  (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that

perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

95.     Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories. For this conduct, Plaintiff and members of the Class are entitled to receive treble damages pursuant to 15 U.S.C. § 15.

96.     As reflected by the recent entry of Defendants into the Amended Relationship Agreement, Defendants' unlawful conduct is ongoing and has not ceased. The present and future conduct by Defendants creates irreparable injury to both the Plaintiff and the Class. Plaintiff and the Class are therefore also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## COUNT FOUR

## RESTRAINT OF TRADE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT— CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)

### (Against All Defendants)

97.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein. This count is presented as an alternative to Count One in the event that the Court finds that the *per se* rule should not apply to Defendants' conduct.

98.     Defendants entered into and engaged in continuing combination, conspiracy or agreement to monopolize trade or commerce in the market for closed system e-cigarettes sold to purchasers in the United States and its territories in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

99.    In particular, Defendants have combined and conspired to divide and allocate the market for closed system e-cigarettes by eliminating Altria as a competitor, with the intended effect of raising, maintaining or stabilizing the prices of closed system e-cigarettes sold to purchasers in the United States and its territories.

100.    The conspiracy to monopolize was evidenced by, *inter alia*: (a) the unlawful Relationship Agreement between Altria and JUUL entered into on December 20, 2018 by which Altria agreed to exit the e-cigarette market in exchange for a 35% stake in JUUL; (b) the unlawful Amended Relationship Agreement entered into between Altria and JUUL on January 28, 2020 that perpetuated this withdrawal; and (c) the commitment given in writing by Altria to JUUL on October 5, 2018 to withdraw Altria's MarkTen Elite products. The purpose of all of these agreements was to raise, maintain or stabilize prices of closed system e-cigarette products, eliminate e-cigarette promotional activity by Altria, and eliminate Altria's independent presence as an innovative force with respect to e-cigarettes.

101.    Defendants' activities were done with the specific intent of conferring upon JUUL a monopoly in the market for the sale of closed system e-cigarettes sold in the United States and its territories.

102.    The relevant product market for the purposes of this Count is the sale of closed system e-cigarettes. The relevant geographic market for the purposes of this count is the United States and its territories as a whole, where both JUUL and Altria marketed their e-cigarette products.

103.    This market definition is appropriate for all of the reasons identified by the FTC in paragraphs 36–42 of its Complaint:

> The relevant product market for the purposes of this action is closed-system e-cigarettes. A hypothetical monopolist in this relevant market would find it profitable to impose at least a small but significant and non-transitory increase in price ("SSNIP").

> E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarette: closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a

heating mechanism, and sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as JUUL or MarkTen Elite, which look like USB drives. Subsequent to the FDA flavor ban that went into effect February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

Closed-system e-cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers. The vast majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

Respondents considered their respective [JUUL] and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Respondents further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

The relevant geographic market is no broader than the United States. Because of the FDA's PMTA [premarketing application] requirements, foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

104.    JUUL possesses monopoly power within this market. As noted above, within the

42

e-cigarette market as a whole, JUUL has obtained a market share of as much as 75%. Its market power is even greater within the closed system e-cigarette market. Its market power is demonstrated by its ability to demand as a contractual term that Altria exit from the business of making and selling e-cigarettes as a precondition to obtaining a 35% stake in JUUL, thus excluding a significant competitor. JUUL also had power over wholesale and retail prices by virtue of its dominant position in the market, which was maintained through its unlawful agreements with Altria.

105.    JUUL's market power is also supported by the econometric analysis made by the FTC in paragraphs 43–45 of its Complaint:

> At the time of Altria's exit, the relevant market was already highly concentrated. Following Altria's exit, it became even more concentrated.

> The federal antitrust agencies, consistent with the Merger Guidelines and federal court decisions, measure concentration using the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

> In the U.S. market for closed-system e-cigarettes, the Transaction resulted in a post-Transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Thus, the Transaction resulted in concentration that establishes a presumption of competitive harm in the relevant market.

106.    The existence of a conspiracy to monopolize is supported by the statement of FTC Commissioners Chopra and Kelly Slaughter in support of the filing of the FTC Complaint:

> Section 2 also prohibits exclusionary conduct when undertaken in concert between two firms. This is an especially pernicious form of anticompetitive conduct. Conspiracies to monopolize require: (1) a conspiracy, such as a plot by a group to engage in something harmful or unlawful, (2) one or more overt acts in furtherance of the conspiracy, and (3) a specific intent to monopolize. I have reason to believe that JUUL and Altria's conduct meets these requirements under the law.

> A number of facts alleged in the Commission's complaint give reason to believe a conspiracy to monopolize existed. For example,

the complaint alleges:

• That JUUL insisted, and Altria understood, that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal;
• That the written agreements between JUUL and Altria required Altria to not only halt competitive activities in the e-cigarette market, but also to commit Altria's considerable resources to entrenching JUUL's dominant position;
• That Altria took affirmative steps to provide JUUL with significant competitive advantages over its rivals. In particular, Altria temporarily leased valuable shelf space to JUUL.[60]

107.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Altria on price, promotional activity, and innovation, reducing consumer choice, and allowing JUUL to raise, maintain or stabilize the prices of closed system e-cigarettes sold to purchasers in the United States and its territories. For this conduct, Plaintiff and members of the Class are entitled to receive treble damages pursuant to 15 U.S.C. § 15.

108.    As reflected by the recent entry of Defendants into the Amended Relationship Agreement, Defendants' unlawful conduct is ongoing and has not ceased. The present and future conduct by Defendants creates irreparable injury to both the Plaintiff and the Class. Plaintiff and the Class are therefore also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

## COUNT FIVE

### RESTRAINT OF TRADE IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18)

### (Against all Defendants)

109.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

110.    The agreements, as described above, in which Altria received a substantial ownership stake in JUUL and for the purposes of which Altria withdrew its existing e-cigarettes from the market and halted its innovation on future products, substantially lessened competition

---

[60] Chopra Statement at 3.

in the market for closed system e-cigarettes in the United States and its territories.

111.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.

## IX.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.    Defendants have combined and conspired in violation of Section 1, 2 and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3) and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

C.    Defendant JUUL has unlawfully monopolized the market for closed system e-cigarettes sold in the United States and its territories in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

D.    Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for closed system e-cigarettes in the United States and its territories, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

E.    Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15) and Section 7 of the Clayton Act (15 U.S.C. § 18);

F.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal

1    rate from and after the date this class action complaint is first served on Defendants;

2    G.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy

3          Defendants' past and ongoing restraint of trade, including:

4          i.    A judicial determination declaring the rights of Plaintiff and the Class,

5                and the corresponding responsibilities of Defendants; and

6          ii.   Issuance of a permanent injunction against Defendants and their

7                parents, subsidiaries, affiliates, successors, transferees, assignees and

8                the respective officers, directors, partners, agents, and employees

9                thereof and all other persons acting or claiming to act on their behalf

10               from continuing and maintaining the conspiracy or agreements alleged

11               herein; and

12         iii.  Divestiture of Altria's equity stake in Juul and rescission of Altria's

13               purchase of that stake.

14   H.    Defendants are to be jointly and severally responsible financially for the costs and

15         expenses of a Court-approved notice program through post and media designed to

16         give immediate notification to the Class;

17   I.    Plaintiff and the Class recover their costs of this suit, including reasonable

18         attorneys' fees as provided by law; and

19   J.    Plaintiff and the Class receive such other or further relief as may be just and proper.

20                      **X.    JURY TRIAL DEMANDED**

21        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

22   claims asserted in this Complaint that are so triable.

23   Dated: July 1, 2020                    Respectfully submitted,

24

25                                          *s/ Michael P. Lehmann*

26                                          Michael P. Lehmann (SBN 77152)
                                            Christopher Lebsock (SBN 184546)
27                                          Bonny E. Sweeney (SBN 176174)

28                                          46

1
2
3
4
5

**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

6
7
8
9
10
11

Scott A. Martin (*pro hac vice pending*)
Irving Scher (*pro hac vice pending*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com
ischer@hausfeld.com

12
13
14
15
16
17
18
19

William G. Caldes
Jeffery L. Spector
Icee N. Etheridge
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
BCaldes@srkattorneys.com
Jspector@srkattorneys.com
IEtheridge@srkattorneys.com

20
21
22
23
24

David P. McLafferty
**McLafferty Law Firm, P.C.**
Attorneys at Law
923 Fayette Street
Conshohocken, PA 19428
(610) 940-4000 ext. 12
DMclafferty@mclaffertylaw.com

25
26
27

Michael J. Boni
Joshua D. Snyder
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road

28

47

Bala Cynwyd, PA 19004
Tel: 610-822-0200
Fax: 610-822-0206
mboni@bonizack.com
jsnyder@bonizack.com

Lee Albert (*pro hac vice to be filed*)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 101689
Tel: (212) 682-5340
Fax: (212) 884-0988
lalbert@glancylaw.com